Rel: May 23, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

_____

### CL-2024-0570

_____

**Stephanie Lawder**

**v.**

**Steven Wade Alexander**

**Appeal from Etowah Circuit Court
(DR-18-900122.02)**

PER CURIAM.

Stephanie Lawder ("the mother") appeals from a judgment of the Etowah Circuit Court ("the trial court") insofar as it denied her visitation with B.M.A. ("the child") and found that she owed Steven Wade Alexander ("the father") past-due child support and interest thereon

totaling $2,739.32. For the reasons set forth herein, we affirm the judgment in part and reverse it in part, and we remand the case with instructions.

Background

The mother gave birth to the child in March 2016, while she was married to the father. The trial court divorced the parties in February 2020. Subsequently, the trial court entered a postdivorce judgment in May 2022 that provided that the parties would exercise custody of the child pursuant to a "week-on/week-off" schedule and that the mother would pay the father child support in the amount of $250.92 per month. It appears that, in June 2022, the trial court modified the May 2022 judgment to reduce the mother's child-support obligation to $224.10 per month.

On November 21, 2022, the mother filed a petition asking the trial court to hold the father in contempt for his allegedly refusing to allow her to exercise custody of the child during the periods when she was entitled to do so pursuant to the May 2022 postdivorce judgment. She alleged that the father had not allowed her to speak to the child since September 14, 2022. The father filed an answer to the mother's petition and a verified

motion asking the trial court either to suspend the mother's visitation or to require that her visitation be supervised because, he said, the mother was mentally unstable and posed a danger to the child. The father's verified motion also requested that the trial court find the mother in contempt for her alleged failure to pay child support for the child in a timely manner and to require the mother to undergo a mental evaluation before she was allowed to visit the child.

In response to the father's verified motion, the trial court, on December 8, 2022, entered an order suspending the mother's unsupervised visitation with the child and granting her supervised visitation with the child for three hours every Sunday and "reasonable FaceTime [videoconferencing] visits with the … child, supervised by the father, pending the hearing set in this case." On March 8, 2023, the trial court held a hearing regarding the parties' contempt motions. On March 17, 2023, the trial court entered an order appointing a guardian ad litem to protect the interests of the child; granting the mother visitation by cellular telephone or social media on Mondays, Wednesdays, and Fridays; ordering the mother to undergo a mental-health evaluation at CED Mental Health Center ("CED"); ordering the mother to provide the

3

trial court with the mental-health evaluation; ordering the parties to set up a one-hour visitation each week at the Family Success Center; and restraining the mother from entering the apartment complex where the father lived.

On March 17, 2023, the father filed a motion asking the trial court to temporarily suspend the mother's visitation and to amend the restraining order to prohibit the mother from coming within 500 feet of the child and the father because, he said, the mother had allegedly behaved in a manner that indicated to the father that she might be dangerous to herself, the child, and the father. He attached to the motion a copy of a social-media post in which the mother said: "I hope people take me seriously when I say I will kill anyone and everyone over my 2 children.[1] I 1000% percent mean that. Be smart. It's not hard. I don't threaten or harm other people's children."

On March 3, 2023, the trial court entered an order noting that the mother had made threats in her social-media posts, again ordering the mother to undergo a mental-health evaluation, temporarily suspending

---

[1]The mother has another child who was fathered by a man who is not the father of the child in this case.

the mother's visitation at the Family Success Center, allowing the mother's supervised visitation by cellular telephone to continue, amending the restraining order to prohibit the mother from coming within 500 feet of the child or the father, and ordering the mother to file a notice informing the trial court when she had scheduled a mental-health evaluation.

Thereafter, the mother, acting pro se, filed a handwritten letter to the trial court in which she disputed the finding that she had made threats in her social-media posts, alleged that the father was harassing and bullying her, alleged that the father had not allowed her to visit with the child by telephone or social media, stated that she wanted a change of venue, and requested that the trial court order that the child be afforded counseling. In response to the mother's letter, the trial court entered an order on May 8, 2023, ordering the guardian ad litem to meet with the child concerning the mother's allegations, setting a hearing for May 31, 2023, and setting a final hearing for July 28, 2023. Apparently, the trial court changed the date of the May 31, 2023, hearing to June 28, 2023. On that date, the trial court entered an order stating that the

mother had failed to appear for the hearing and, consequently, denying the relief that the mother had requested in her letter.

On July 28, 2023, the trial court held a hearing and, that same day, entered an order in which the trial court made the following pertinent findings:

> "6. The mother has not retained counsel to date and in all proceedings since January 25, 2023, has proceeded as a pro se litigant. On March 17, 2023, the [c]ourt entered a Second Interim Order after receiving testimony and evidence and observing the mother's demeanor at the hearing. The March 17th Order appointed Stephanie Gillilan as [guardian ad litem] to represent the best interests of the ... child, provided specific FaceTime phone visits, modified the supervised visitation to be supervised by the Family Success Center's supervisory service, with the visits to take place 1 day each week after the parties coordinated same with the Family Success Center, and the mother was further restrained from entering the apartment complex where the fathe[r] lives with the ... child. Finally, the [c]ourt ordered the [mother] to undergo a mental[-]health assessment through CED Mental Health Center and for the mental[-]health assessment to be provided to this [c]ourt pursuant to a separate Protective Order entered on March 17th. This Second Interim Order was entered by the [c]ourt after receiving testimony and evidence in the case, ore tenus, and observing and considering the mother's testimony, her actions and her demeanor at the March 8, 2023, hearing.

> "7. On March 17, 2023, at 4:17 [p.m.], after this [c]ourt's March 17, 2023, Order was entered at 10:45 [a.m.], the father filed a Motion to Temporarily Suspend the Mother's Visitation and to Amend the Restraining Order. The [c]ourt on March 20, 2023, suspended the mother's supervised visits at the

6

Family Success Center, but allowed the FaceTime visits with the ... child to continue. The [c]ourt also modified the March 17, 2023, Restraining Order adding that the mother shall at no time come within 500' of the ... child, the father, or his apartment complex.

"After viewing the Facebook posts submitted with the father's March 17th motion, the [c]ourt found that the mother's posts included threats of violence and further confirmed the [c]ourt's previous findings that the mother may be suffering from severe mental[-]health issues. The [c]ourt reiterated in its March 20, 2023, Order that the mother comply with this [c]ourt's previous Order for a mental[-]health assessment to be performed and provided to the [c]ourt.

"8. A hearing was held this date, July 28, 2023, after rescheduling previous settings due to conflicts by counsel for the father. The [m]other testified a mental[-]health assessment has been performed, that she is continuing to receive mental[-]health care through continued visits to CED Mental Health Center and is currently seeing a local psychiatrist here in Gadsden to receive her mental[-]health medication. The [c]ourt directed counsel for the father to issue subpoenas to CED Mental Health Center to receive records to confirm the testimony of the mother, and to issue a subpoena to Dr. Kushro Huma ....

"....

"10. The [c]ourt further notes that the [guardian ad litem] in this case, in addition to the father, has concerns with the mother's current mental state as stated in open [c]ourt July 28, 2023. The [guardian ad litem] further represented to the [c]ourt that given the mother's current mental state she could not agree with the mother's continued supervised visits, in-person and via FaceTime, phone or other means with the ... child, until such time [as] the [c]ourt is presented with a current mental[-]health assessment and records of the mother

7

from CED Mental Health and the mother's medical records reviewed by the [c]ourt with her psychiatrist, Dr. Kushro Huma.

"11. The [c]ourt has previously entered a Protective Order as to the CED Mental Health Center records of the mother on March 17, 2023, and will issue a separate Protective Order relating to Dr. Kushro Huma's records of the mother simultaneously with entry of this Third Interim Order.

"12. The [c]ourt also notes from the testimony and evidence received July 28, 2023, that the mother made an 'alarming' … call to 911 alleging she had killed several people, which was in fact untrue, but was done to get the attention of 911, in addition to the 911 call evidencing the mother has shot a firearm in the Country Club neighborhood of Gadsden.

"13. The [c]ourt further notes for the record that the mother has been arrested and plead[ed] guilty to Attempting to Elude and Reckless Driving recently and that she has a pending case in the District Court of Etowah County, Alabama with the charge of Unlawful Possession of Drug Paraphernalia which remains pending in District Court ... before District Judge Willis H. Clay.

"14. The [guardian ad litem] also informed the [c]ourt that the ... child has done excellent at Carlisle Elementary while she has been in the father's sole custodial care.

"15. The [c]ourt to date has been trying to assist the mother with a 'road map' to address her current mental[-]health issues in hopes of trying to restore the mother's mental health and reunite her with her ... child, but to date the mother has failed to comply with the directions of the [c]ourt, continues to show evidence of mental[-]health decompensation at hearings before this [c]ourt, in addition to now receiving criminal cases in Municipal Court to which she

> has plead[ed] guilty and one case which the [c]ourt understands is still pending in Etowah County District Court."

Based on those findings, the trial court awarded the father temporary sole physical and sole legal custody of the child; terminated all the mother's visitation; stated that, upon receipt of the mother's mental-health records, the trial court would address the custody and visitation of the mother; and set the case for a hearing on October 11, 2023.

On October 2, 2023, the mother filed a second handwritten letter to the court in which she asserted that she had previously proved the father's allegations to be false, that there was no evidence indicating that she posed a risk to the child, that it was a "known fact" that she had "fragile mental health under stress," that she had suffered trauma because of "a paranoid father," and that her social-media posts were not threats. She attached a mental-health evaluation that CED had performed on her in May 2023.

On November 15, 2023, the mother filed a third handwritten letter in which she asked the trial court to enter an order sending her to rehabilitation, stated that she was sorry that pressure and stress had caused her to relapse, and asked the trial court for telephone visitation

with the child. That same day, the trial court entered an order regarding the mother's third handwritten letter that found that the mother was currently serving a sentence in the Etowah County Detention Center in an unrelated case in Gadsden's municipal court; that she would not complete her sentence until sometime in May 2024; and that, while she was incarcerated, the trial court would try to set up a mental-health and substance-abuse assessment in hopes that, once she completed her sentence, she could enter into a co-occurring inpatient facility or such other facility per her assessment. Also on November 15, 2023, the trial court entered an order awarding the father temporary custody of the child and providing that the mother would not have any visitation at that time.

On January 9, 2024, an attorney filed a notice of appearance on behalf of the mother. On February 2, 2024, the trial court held a review hearing and entered an order granting the mother telephone visitation with the child for 15 minutes each Sunday and ordering the guardian ad litem to meet with the child and to file a motion to modify the mother's telephone visitation if the child did not want to have telephone visitation with the mother. On February 8, 2024, the child's guardian ad litem filed

a report stating that she had met with the child to discuss the proposed telephone visitation between her and the mother, that the child had not had any contact with the mother since July 2023, and that, in the guardian ad litem's opinion, the child was not emotionally ready for telephone visitation with the mother. That same day, the trial court entered an order suspending the mother's telephone visitation and stating that the trial court would reconsider the issue of telephone visitation once the mother had provided the trial court with documentation regarding her mental-health treatment and progress in her substance-abuse treatment.

On March 28, 2024, the guardian ad litem notified the trial court that the mother had provided her with copies of medical records from Christ Health Center and from Ascension St. Vincent's East Emergency Department regarding the mother. On April 8, 2024, the mother filed a motion requesting that the trial court allow her telephone visitation with the child before the final hearing, which was then scheduled for April 29, 2024. On April 9, 2024, the trial court ordered the guardian ad litem to file a response to the mother's April 8, 2024, motion within seven days. That same day, the father filed a response to the mother's motion in

11

which he objected to the trial court's granting the mother telephone visitation with the child. On April 15, 2024, the guardian ad litem filed a response to the mother's motion, in which the guardian ad litem advised the trial court that the Lovelady Center, a drug-rehabilitation facility, had informed her that the mother, who had been a patient at the Lovelady Center, had left that facility; the guardian ad litem recommended that the trial court address the mother's motion at the final hearing. On April 15, 2024, the trial court denied the mother's motion for telephone visitation before the final hearing.

On April 29, 2024, the trial court entered an order reciting that the parties had appeared for the final hearing on that day, that the mother had subpoenaed her records from Christ Health Services, the Lovelady Center, and the UAB substance-abuse program, that the mother had wanted the trial court to review those records before making a final decision in the case, and that, consequently, the trial court had reset the final hearing for June 11 and 12, 2024.

On May 14, 2024, the mother filed a motion alleging that four of her drug screens had been negative for the presence of illegal drugs and requesting that the trial court grant her telephone visitation with the

12

child before the final hearing. On May 15, 2024, the trial court entered an order denying the mother's motion.

On June 11 and 12, 2024, the trial court held a final hearing at which the mother and the father testified and the parties and the trial court introduced exhibits into evidence. The mother testified that she had gone to live with her grandmother at some point when she was a child because, the mother said, her mother had become addicted to drugs. The mother also said that, at some point during her childhood, she became a victim of sexual abuse. She said that her sister had become a drug addict and, ultimately, the mother herself had become addicted to drugs. The mother testified that, after college, she had been a nurse but that she had had to surrender her nursing license to the Alabama Board of Nursing.

The mother testified that, when she was 21, CED diagnosed her as suffering from anxiety and depression and had prescribed medication for treatment of those conditions. Later, she testified, her father bled to death in front of her, and she was then diagnosed with PTSD. At some point, she stopped taking her medication for her anxiety and depression because, she said, the father had claimed in a previous court proceeding that the medication made the mother too drowsy to take care of the child.

13

She said that, after the present dispute with the father had begun, she had lost her job and, consequently, had lost her apartment, and had begun living in her automobile.

The mother said that, approximately four months after the present dispute with the father had begun, she had relapsed into using methamphetamine every day. She testified that she had made the social-media posts to which the father had objected while she was taking methamphetamine and that she was ashamed of things she had done while she was taking methamphetamine. The father introduced those social-media posts, which range in date from March 2023 to June 10, 2024, which was approximately four months before the trial. The 2023 social-media posts include the following:

> "If my kids can't have me, no one can, not even 'God.' Or spirit, whomever is supposed to be our 'creator.' F**k everyone!! Lose my number. And I mean everyone!!!! Family in Georgia, ever [so-called] 'fam' here in Gadsden. Everyone, f**k y'all and your God and the whole United States. I hope Satan eats ev[e]ryone[] of your souls for a snack. [Because] I don't give a f**k no more. … Frank, Daniel and [J.P.] burn in hell. Oak Park burn in hell[.] Walnut Park burn in hell[.] Anyone of blood kin to me burn in hell[.] Sansom, Forrest, Gadsden City and anyone who[']s ever met me burn in hell[.] The retards and geniuses Burn in hell[.] ..."

> "The whole human race has let me and my children down. I just here [sic] soon. It's me and my children no matter

what men make me seem 'crazy.' … [M]eet me somewhere and line up s[o] I can off your ass. … I regret not plac[ing] that bullet somewhere else besides the dirt next to my foot."

"My kids deserve a public apology on d\*\*n television by every b\*\*\*\*\*d in this town. Especially [the father] and [the Marshall County Department of Human Resources] and [the trial-court judge] … Return [the child] [before] this gets [worse] for anyone else. … And [don't] dare say [I'm] crazy[.] [N]ot a d\*\*n soul needs to say that [because] if I was crazy [you'd] already be dead[.] Best believe[.] …"

"I hope people take me seriously when I say I will kill anyone and everyone over my 2 children. I 1000% percent mean that. … "

On May 27, 2024, the mother posted:

"My God is about to deal with the people in my children's lives that try to prevent them from having a healthy relationship with their mother. My daughter has been abused by her father and the [E]towah [C]ounty court[] system for allowing him to do what he's done to mine and hers relationship. … There's a difference in having a drug problem and an evil [ex-husband] problem. God saw everything and is still seeing everything and certain [people's] [doomsday] is very near for them."

On May 29, 2024, the mother posted a picture of the motion-picture character "Chucky" and wrote: "Woke up thinking about all the [s]\*\*t I let slide. … I'm going to [j]ail this summer." On May 30, 2024, the mother posted:

"Lord[,] please please help me to be patient. I sit around and watch how Satan is trying to set me up with anything and

15

everything all because I'm starting to speak up for myself. I have always been able to speak up for others but for some reason I couldn't for myself. Everyone said I needed some healing so that means a bunch of dark[,] sick things I didn't wanna face that I kept buried for a long long time has and is gonna come rolling out and accountability is gonna be handed out where it is rightfully deserved. … God's [about] to fix this and I trust him fully. He knows both sides and the truth, not just [the father's] opinions."

On June 7, 2024, the mother posted:

"People are going to leave me the hell alone. God is going to give me and the kids back double what was stolen from us and that is most importantly our memories and time we could have had together. This s**t show is going to stop[.] I don't care if I go to jail for my children's mental and psychological health and respect."

On June 8, 2024, the mother posted:

"This ring of little boys running around giving women Liquid G and sexually assaulting and taking photos of them while unconscious, just know your time is near to [be] hung from a nice, big tree in Gadsden. I know well too many women this has been done [to] and it's just time it stops since it's easier to escape appropriate charges [because] [you are] all snitches for feds and dtf. The ones from Southside and North Gadsden, all of [you]. [T]he whole Satanic cult y'all have been going on is [about] to be busted up by some real men of God. There's the police, then there's God's police. Since DTF and some of the police are crooked in [E]towah [C]ounty, it must be handled by God's people. And if I get harassed [because] of this post just know it won't go well for anybody involved. Thanks. [W]atch out [because] you never know if that regular[-]looking man next to you is gonna be the last person you get to see or not."

On June 10, 2024, the mother posted:

"Everything I have done the past few years has felt like it's pre-programmed to already happen. Is this God or is it [d]eja vu etc.??? Something's just really weird. I have done all the things I am doing [because] I have the memories, yet everyone else is saying I have never done these certain things before. Wtf!!!!!"

The mother testified that she had entered the inpatient substance-abuse program at The Lovelady Center on December 21, 2023, and that she had stayed there until the end of April 2024. She testified that her other child's father had brought the other child to The Lovelady Center to visit her on Christmas Day and on the other child's birthday. The mother said that all her drug screens were negative for the presence of illegal drugs while she was at The Lovelady Center. She said that she decided to transfer from The Lovelady Center to the UAB substance-abuse program because, she said, the Alabama Nursing Board had told her that it would not accept proof of her sobriety from The Lovelady Center in determining whether to reinstate her nursing license but that it would accept proof of her sobriety from UAB for that purpose. She testified that she had transferred from The Lovelady Center to the UAB substance-abuse program at the end of April 2024, and that she was still receiving substance-abuse and mental-health treatment through UAB at

17

the time of the trial of this action. The mother denied that she had quit The Lovelady Center or had unilaterally decided to leave that facility and said that she had transferred to the UAB substance-abuse program rather than dropping out of The Lovelady Center. She said that she did not get a certificate of completion of the substance-abuse program from The Lovelady Center but that she did get a letter from The Lovelady Center transferring her to the UAB substance-abuse program. She testified that UAB personnel perform random drug screens on her one to two times a week and that she receives both group and individual counseling. She said that all her random drug screens at both The Lovelady Center and at UAB had been negative for the presence of illegal drugs. The mother testified that, at the time of the trial in this case, she had been participating in intensive outpatient substance-abuse treatment at UAB for two months. Her UAB records indicate that, on three occasions, the mother had left Zoom classes at UAB, once because she was sick and twice without explanation.

The mother testified that, two weeks after she had entered The Lovelady Center, she had begun seeing a psychiatrist at Christ Health Center. According to the mother, the psychiatrist gave her new

18

prescriptions for Wellbutrin and Buspar to treat her depression and anxiety. She said that she takes Wellbutrin once a day, that she takes Buspar twice a day, and that those medications were working well for her. She said that she also has a prescription for Vistaril for out-of-the ordinary anxiety attacks but that she had taken only one of those pills since December 2023. The mother testified that she sees her psychiatrist at Christ Health Center once per month and that she also sees a psychiatrist or psychologist at UAB once per month.

The mother testified that she is doing well currently and that she is emotionally and mentally stable. She said that she had done all that she could to overcome her drug addiction and mental-health problems. The mother said that she was living in a two-bedroom, two-bathroom apartment and that she had gotten a job at a Publix grocery store. She said that she goes to work at 4:00 a.m. to make salads and desserts in the Publix bakery and that she gets off work at 12:00 p.m. She testified that she had told Publix that she was in outpatient treatment for substance abuse at UAB and that Publix was letting her work around her appointments at UAB. The mother said that she is earning $14.50 per hour and that she would receive her first paycheck from Publix in a

couple of days. She said that she wants to pay child support and that she will begin paying again when she receives her first paycheck from Publix.

The mother testified that, since December 2023, she has done everything she could to see the child. She said that the child's half-sibling had been begging to see the child because, she said, he had not seen the child for the same period that she had not seen the child. She said that, in the past, when the trial court had ordered that she have visitation with the child, the father had not always obeyed the trial court's order and had not let her see the child. The mother testified that the father has two forms of mental illness.

The mother testified that she would like to have standard visitation with the child, including overnight visits. She said that she would be willing for the child's guardian ad litem to inspect her apartment to make sure that it was acceptable for the child. She testified that she would also like for the child to receive counseling because, she said, she knew from her own experiences that a dispute like the one between her and the father was hard on a child.

On cross-examination, the mother denied that she had been diagnosed with bipolar disorder. She testified that there is a difference

20

between a diagnosis of bipolar one or bipolar two, on the one hand, and bipolar, unspecified, on the other. According to the mother, a diagnosis of bipolar, unspecified, equates with a diagnosis of anxiety and depression, without mania.

She testified that the last time she had used methamphetamine had been on November 7, 2023, shortly before she entered The Lovelady Center. She said that using methamphetamine made her paranoid. She admitted that her May 8, 2023, CED evaluation stated that she had not experienced trauma, but she insisted that that was a mistake because, she said, she had indeed experienced trauma.

The mother admitted that, in April 2023, she had been arrested on charges of eluding the police, attempting to elude the police, resisting arrest, and reckless driving and that she had pleaded guilty to those charges. She also admitted that, on July 4, 2023, she had been arrested on a charge of driving under the influence of a controlled substance and that she had pleaded guilty to that charge. Moreover, she admitted that, on July 7, 2023, she had been arrested on a charge of possession of drug paraphernalia and that she had pleaded guilty to that charge.

The mother testified that she had gone to CED on one occasion after her evaluation on May 8, 2023, but that UAB took over her mental-health treatment after that second visit to CED. The mother admitted that she had undergone a substance-abuse evaluation in 2018 and that she had completed six weeks of intensive outpatient treatment for substance abuse at Bradford.

The mother testified that she had worked for Walmart for eight months in 2023 and that her child support was deducted from her paycheck during those eight months. She did not, however, testify that the only child-support payments she had made since commencing the present action were the ones that Walmart had deducted from her paycheck during the eight months she had worked for Walmart. Specifically, she testified:

> "[The father's counsel]: Q How long did you work with Walmart?
>
> "[The mother]: A Walmart, last year, eight months.
>
> "Q Did you pay any child support during that time?
>
> "A Yes It came out of my check.
>
> "….

"Q Okay. And you worked at Walmart for over a year, and you didn't pay any child support then, did you?

"A Yeah, I did. It came out of my checks. It was eight months I worked at Walmart.

"Q You're behind on child support, correct?

"A Yes.

"Q $2,700, I believe, correct?

"A No.

"Q How much are you behind?

"A [$]1,900."

The father's counsel offered as evidence an e-mail from a Department of Human Resources ("DHR") caseworker that stated that, as of June 5, 2024, the mother owed a child-support arrearage in the amount of $2,231.46, and interest thereon in the amount of $313.76 and $224.10 for June 2024, which totaled $2,769.32. The mother's counsel objected to that e-mail being admitted into evidence because, he said, it was hearsay. The trial court sustained the objection when the father's counsel initially offered that e-mail for admission into evidence, but, later in the trial, the following colloquy regarding that e-mail occurred:

"THE COURT REPORTER: You just didn't admit that one.

"THE COURT: What was the Yolonda James? I can't remember.

"[The father's counsel]: Eight is the --

"[The mother's counsel]: It was the child support thing.

"THE COURT: Oh.

"[The mother's counsel]: I objected to hearsay.

"THE COURT: Okay.

"[The father's counsel]: I can put [the father] back on the stand.

"THE COURT: No, no I'm going to overrule [the mother's objection to the e-mail]. I'll let it in to the weight, but I understand your objection, and or she had around 2,900, whatever. [The e-mail] is admitted."

The mother admitted that her friend F.P. had filed a protection-from-abuse petition against her when she was using methamphetamine. The mother denied calling 911 and reporting that she had killed a bunch of people. However, the father's counsel then played a tape recording of the 911 call. On the recording, the mother said: "I just killed a bunch of people." The mother said that she was high when she made that 911 call. The father's counsel also played a tape recording of a 911 call that F.P. made on the same occasion in which F.P. said: "[T]his girl is crazy. She's out in my yard shooting a gun."

24

The mother testified that there was a court order stating that she did not have custody of, or visitation with, her other child but that she and that child's father had informally agreed that he would bring that child to see her every other weekend.

The father testified that he has a bachelor's degree from the University of Alabama in social work and that he had been admitted to graduate school at the University of Alabama to obtain a master's degree in social work. He said that he was a former police officer.

The father testified that, since the child had been in his sole custody, the child had been happy, had been well-behaved, had been doing well in school, and had been doing well in extracurricular activities. He said that, based on his observations of the mother, she was mentally and emotionally unstable and that, based on her social-media posts, she was dangerous. He testified that, in his opinion, awarding the mother any kind of visitation, including supervised visitation, would not be in the child's best interests, and he asked the trial court not to award her any kind of visitation.

On June 20, 2024, the trial court entered a final judgment. In pertinent part, the judgment stated:

"1. The Court readopts its Findings of Fact set forth in its July 28, 2023[,] Third Interim Order in this case as if fully set out herein.

"2. Since the date of this [c]ourt's July 28, 2023[,] Findings of Fact adopted herein, the [m]other has spent time in the Etowah County Detention Center ('ECDC') for approximately 3 weeks in November of 2023 on City of Gadsden case(s) for failing to appear in court. Thereafter, the [m]other entered into the Lovelady Center on or about December of 2023. Lovelady Center is a 9 to 12-month faith-based recovery program for women.

"3. The [m]other testified she left the Lovelady Center prior to completing their 9 to 12-month program and transitioned to the UAB Intensive Outpatient Program ('UAB IOP') because the Alabama Nursing Board would recognize the UAB IOP if she ever tried to be reinstated as a Registered Nurse in Alabama; however, no evidence was presented by the [m]other evidencing the Alabama Nursing Board is considering reinstating her Registered Nurse license. The [m]other at the time of the final hearing remains in the UAB IOP and has been a part of this program since April of 2024.

"4. The [c]ourt noted in its July 28, 2023[,] Findings of Fact the following:

"'The [c]ourt to date has been trying to assist the [m]other with a 'road map' to address her current mental[-]health issues and addiction issues she has struggled with in hopes of trying to restore the [m]other's mental health and reunite her with her ... child.'

"Understanding the [m]other is currently in a certified intensive outpatient program at UAB, the [c]ourt finds their [sic] is much work to be done on behalf of the [m]other to face her mental[-]health conditions of depression, anxiety and bi-

polar disorder, unspecified, given the testimony presented in this case.

"5. The [c]ourt further finds from the testimony, the ... child is doing well in school with her grades and in her extracurricular activities. The [c]ourt also notes in the February 8, 2024[,] [guardian ad litem] Report filed in this cause, it was the [guardian ad litem's] position after meeting with the ... child [that the child] was not emotionally ready to have supervised phone visitation with the [m]other, much less supervised [physical] visitation.

"Based upon the evidence received and considered by the [c]ourt, ore tenus, it is

"ORDERED, ADJUDGED AND DECREED as follows:

"1. The [c]ourt hereby modifies the parties' true shared custodial relationship with the ... child and awards the [f]ather ..., the sole legal and physical custody of the ... child .... The [m]other shall have no visitation with the ... child. The [c]ourt finds this is in the best interests of the parties' ... child.

"2. As previously ordered by this [c]ourt, the [m]other shall continue to pay to the [f]ather towards the support and maintenance of the ... child, the sum of Two Hundred Twenty[-]Four and 10/100 ($224.10) DOLLARS, per month. Said child support shall continue on the first (1st) day of each month hereafter as previously ordered in the Amended Final Order in the .01 case, and shall continue to be due and payable on the first (1st) day of each month thereafter, until the ... child shall reach the age of majority according to the State of Alabama, shall marry, die, or otherwise become emancipated.

"3. The [c]ourt finds the [m]other is in arrears in her child support obligation to the [f]ather in the sum of Two Thousand Seven Hundred Sixty-Nine and 32/100 ($2,769.32) Dollars. The [m]other shall repay this child[-]supporting

27

arrearage to the [f]ather at the rate of $30.00 per month, said payments to begin on the first day of July, 2024 and on the first day of each consecutive month thereafter until said arrearage and all interest accrued thereon is paid in full."

(Emphasis added; capitalization in original.)

The mother timely filed a postjudgment motion. Following a hearing on that motion, the trial court entered an order denying it. The mother then timely appealed.

<u>Standard of Review</u>

When a trial court makes child-custody and visitation determinations based on evidence it hears ore tenus, an appellate court accords a presumption of correctness to the trial court's findings regarding disputed facts and will not reverse the trial court's judgment based on those findings unless it is palpably erroneous or manifestly unjust. See <u>J.L.W. v. C.J.P.</u>, [Ms. CL-2023-0561, May 17, 2024] ___ So. 3d ___ (Ala. Civ. App. 2024); and <u>B.C.H. v. M.H.</u>, 323 So. 3d 661, 669 (Ala. Civ. App. 2020). However, the presumption of correctness is rebuttable, and may be overcome when there is insufficient evidence presented to the trial court to sustain its judgment. <u>B.C.H.</u>, 313 So. 3d at 669. Alabama law does not allow an appellate court to substitute its judgment for that of the trial court or to reweigh the evidence. See <u>J.L.W.</u>, ___ So. 3d at ___.

"'In ore tenus proceedings, the trial court is the sole judge of the facts and of the credibility of the witnesses, and it should accept only that testimony which it considers worthy of belief.'" Ex parte R.E.C., 899 So. 2d 272, 279 (Ala. 2004) (quoting Clemons v. Clemons, 627 So. 2d 431, 434 (Ala. Civ. App. 1993)). The ore tenus presumption of correctness does not apply to the trial court's conclusions of law or its application of the law to the facts. See B.C.H., 323 So. 3d at 669.

A trial court's evidentiary rulings are generally left to the discretion of the trial court, and the trial court's determination on those questions will not be reversed except upon a clear showing of an abuse of discretion. See Madrigal v. Madrigal, 399 So. 3d 258, 263 (Ala. Civ. App. 2023).

Analysis

The mother first argues that the trial court erred by refusing to award her any visitation with the child. A trial court has discretion in determining visitation, and an appellate court will not reverse a trial court's determination regarding visitation unless it is so contrary to the evidence presented as to amount to plain abuse of that discretion and is therefore contrary to the best interests of the child. See M.B. v. L.B., 154 So. 3d 1043, 1047 (Ala. Civ. App 2014). In making determinations

29

regarding visitation, a trial court must consider the specific facts and circumstances of the case before it. Id.

In the present case, it is undisputed that, before entering The Lovelady Center in December 2023, the mother had been addicted to and had been using methamphetamine. It is also undisputed that, while under the influence of methamphetamine, the mother was unstable and that she had fired a gun in the yard of a friend. It is also undisputed that the mother had made social-media posts threatening to commit acts of violence. Although the mother blamed her use of methamphetamine for her strange and threatening posts on social media, she testified that she had last used methamphetamine in November 2023. Her strange and threatening posts on social media continued up until approximately four months before the trial. The trial court reasonably could have found that the mother has serious mental-health problems that have not been effectively addressed by the treatment she testified that she had received and the medication she testified that she had been taking for her mental-health problems.

In addition, it was undisputed that the mother had committed several crimes, including driving under the influence of an illegal

substance and eluding the police, that placed both her life and the lives of other people at risk. Finally, it was undisputed that, since relapsing into methamphetamine use before the trial of this action, the mother had not successfully completed her treatment for substance abuse at either The Lovelady Center or at UAB. Moreover, the trial court was able to observe the mother's demeanor when she appeared at several hearings and testified at the trial. An appellate court, which is limited to a written transcript of the trial, cannot match the trial court's vantage point in evaluating the mother's demeanor and credibility as a witness. Accordingly, based on the evidence that was before it, we find no error in the trial court's judgment insofar as it refused to award the mother any visitation.

The mother next argues that the trial court erred in finding that she owed the father a child-support arrearage in the amount of $2,769.32 because, the mother says, the only evidence that supported that amount of child-support arrearage was the e-mail from a DHR caseworker that the mother had objected to on the ground that it constituted hearsay. In response, the father makes the following argument:

> "The mother testified she was only $1900 in arrears as to her child[-]support obligation. She did not explain her

determination of that amount. She also testified [that] during the pendency of this case, she had only paid child support for the eight months she was employed by Wal-Mart [sic]. Based upon her testimony, during the nineteen months the case was pending, she only worked eight months for Wal-Mart [sic]. Her obligation would have been $2,464 for the remaining eleven months. She did not include interest in her calculation. The Court [of Civil Appeals] has held the trial court 'is without authority to waive the imposition of statutorily imposed post-judgment interest upon such payments.' Collins v. O'Neil, 228 So. 3d 1003 (Ala Civ. App 2017)."

However, the record does not support the father's contention that the mother testified that, during the 19 months the case had been pending, "she had only paid child support for the eight months she was employed by Wal-Mart [sic]." The mother did testify that she had worked at Walmart for 8 months while the case was pending and that Walmart had deducted her child-support payments from her paycheck during those 8 months; however, she did not testify that those 8 months were the only months for which she had paid child support during the 19 months the case had been pending. She was never asked to testify regarding the total number of months for which she had paid child support during the 19 months the case had been pending. Thus, the father's argument is based on an erroneous premise, i.e., that the mother testified that she had paid child support for only 8 of the 19 months the

32

case had been pending. Accordingly, we find no merit in the father's argument.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), Ala. R. Evid. The DHR caseworker who wrote the e-mail regarding the mother's child-support arrearage did not testify at the trial. Thus, the content of the e-mail was a statement that was not made by a witness testifying at the trial. And the father offered the e-mail as evidence to prove the truth of the matter asserted in the e-mail, i.e., the amount of the mother's child-support arrearage. Consequently, the content of the e-mail fell squarely within the definition of hearsay. Subject to exceptions not here applicable, hearsay is not admissible. See Rule 802, Ala. R. Evid. An error in the admission of evidence can be harmless if it does not injuriously affect the substantial rights of the party against whom the evidence was introduced, see Rule 45, Ala. R. App. P.; however, the admission of the e-mail from the DHR caseworker injuriously affected the substantial rights of the mother in this case because it indicated that her child-support arrearage was more than the $1,900 to which she had testified.

33

Therefore, we reverse the trial court's judgment insofar as it determined that the mother's child-support arrearage was $2,769.32, and we remand the case for the trial court to determine the amount of the mother's child-support arrearage based on the admissible evidence presented to it and without relying on the inadmissible content of the e-mail.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

Moore, P.J., and Edwards and Hanson, JJ., concur.